# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8341 | **DATE** | 7/18/2003 |
| **CASE TITLE** | Geraldine Tropp vs. Western-Southern Life Insurance Co. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/1/2003 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 7-1, 40-1) is granted in part and denied in part. Motion for class certification (Doc. No. 33-1) is denied without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 22 2003 date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 7/18/2003 date mailed notice |

| ETV | courtroom deputy's initials | |
|---|---|---|

Document Number

4

47

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED

JUL 2 2 2003

GERALDINE TROPP, as Administrator of the )
Estate of MARY E. MIKOS, individually and )
on behalf of all other persons and entities )
similarly situated, )
                   )
           Plaintiff, )
                   )
        v. )      No. 02 C 8341
                   )
WESTERN-SOUTHERN LIFE INSURANCE CO., )      Judge Rebecca R. Pallmeyer
d/b/a WESTERN-SOUTHERN FINANCIAL )
GROUP, et al., )
                   )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

On March 12, 2003, Plaintiff Geraldine Tropp[1], administrator of the estate of her deceased

mother Mary Mikos, filed a five count amended class action complaint ("Amended Complaint")

against Defendant Western and Southern Life Insurance Company ("Western"). In count I of the

Amended Complaint, Tropp alleges that Western violated the Illinois Consumer Fraud and

Deceptive Business Practices Act, ("Consumer Fraud Act"), 815 ILCS 505/1, et seq., by

overcharging Mikos on annual premiums in connection with Mikos' life insurance policy. In counts

II through V, Plaintiff alleges claims for breach of contract, breach of fiduciary duty, an accounting,

and unjust enrichment in relation to Defendant's alleged breach of a settlement agreement reached

in a separate nationwide class action lawsuit, Joseph F. Kreidler v. Western-Southern Life

Assurance Co., No. 95 CV 157, Erie County, Ohio Common Pleas Court. Defendant has moved

for summary judgment, arguing that Tropp's Consumer Fraud Act claim is barred by: (1) the terms

of the Kreidler settlement, (2) the doctrine of res judicata; and (3) the statute of limitations

---

[1] The court notes that Plaintiff's name was misspelled in a number of the early filings
in this case as "Trapp," instead of Tropp. In fact, the court's docket incorrectly records this case
as "Trapp v. Western-Southern Life Ins. Co." Plaintiff has corrected this spelling error in the
materials relevant to Defendant's motion.

47

applicable to the Act. Defendant argues, further, that Plaintiff's remaining claims related to its alleged breach of the *Kreidler* settlement agreement fail because: (1) Plaintiff has no standing to assert these claims; and (2) Tropp has not complied with a condition precedent of the *Kreidler* settlement agreement.

For the reasons set forth in this opinion, Defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND[2]

Defendant Western is a national insurance company based in Cincinnati, Ohio that specializes in selling relatively low limit death policies, with moderate premiums, to older men and women. (Amended Compl. ¶ 1.) Plaintiff Geraldine Tropp is a resident of Frankfort, Illinois and is the administrator of the estate of her mother Mary Mikos, formerly a resident of Blue Island, Illinois, who was a holder of a life insurance policy issued by Defendant.[3] (*Id.* ¶ 2.)

---

[2]    Neither side has provided a 56.1 Statement in connection with Western's motion for summary judgment. Instead, Western primarily relies on the facts set forth in Plaintiff's Amended Complaint and argues that summary judgment is proper as a matter of law. The court will note, however, those instances in which the parties dispute issues of fact.

[3]    This case was originally filed in the Circuit Court of Cook County on September 27, 2002, but Defendant removed the case to this court. The court has jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. § 1332. In determining whether diversity jurisdiction is proper, the court looks at the "complaint as it existed at the time the petition for removal was filed." *United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008, 1014 (7th Cir. 1994). Neither side questions that the parties in this case are diverse. For the purposes of diversity jurisdiction, the legal representative of a decedent is deemed to be a citizen of the same state as the decedent was prior to his or her death. *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 168 (7th Cir. 1992), citing 28 U.S.C. § 1332(c)(2). Mikos was a resident of Illinois and Western is an Ohio corporation. Although neither side provides the location of Western's principal place of business, the court is not aware of any argument or evidence suggesting that the location is in Illinois, which would defeat diversity jurisdiction. The court also noted a question regarding the amount in controversy. At a status conference, Plaintiff's counsel urged the court to remand the case, suggesting (without any rationale) that to retain jurisdiction would be "a risk." More recently, however, Plaintiff has acknowledged that the amount in controversy is sufficient to grant this court diversity jurisdiction. (Plaintiff's Response, at 13.) The court agrees. First, Plaintiff has asserted a claim under the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, which permits Plaintiff to seek actual and punitive damages, along with her

(continued...)

On May 1, 1983, Mikos, who was 74 years old at the time, purchased a life insurance policy from Western, policy number 50017531, (hereinafter, "1983 Policy"), with a total face amount of $2,000. (*Id.* ¶¶ 9-10.) According to the terms of the 1983 Policy, the annual premium was $364.90, but the premium was $189.74 if it were paid semi-annually, $96.70 if paid quarterly, and $36.34 if Mikos paid the premium on a monthly basis. (*Id.* ¶ 10.) For an undetermined reason, however, Mikos was prohibited from paying the premium on any other basis than monthly, until 1986. (*Id.* ¶ 11.) In paying the monthly premium, Mikos paid a total of $437.76 a year for the policy ($36.48 over 12 months),[4] and she continued to pay this monthly premium for three years and eight months. (*Id.* ¶ 12.) Subsequently, in 1986, when Mikos became eligible under the terms of the 1983 Policy to pay the premium on an annual basis, Western did not alter the amount billed for her annual premium and instead continued to bill Mikos for an annual premium of $437.76, which she paid without objection, even though the terms of the 1983 Policy provided for an annual premium of $364.90. (*Id.* ¶ 13.)

---

[3](...continued)
attorneys fees. *Cripe v. Leiter*, 184 Ill. 2d. 185, 191, 703 N.E.3d 100, 103 (1998). Although Plaintiff's actual damages alone are not sufficient to meet the $75,000 jurisdictional requirement, it is possible that those damages, in addition to the punitive damages related to Tropp's claim combined with her attorney fees would meet the required threshold. As a result, the court believes that Plaintiff's claim has met the amount in controversy requirement for diversity jurisdiction. *Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1211 (7th Cir. 1995) ("[w]here both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining the jurisdictional amount."); *see also Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5188, 1999 WL 1044923, at *2 n.1 (N.D. Ill. Nov. 21, 1999) (attorneys fees are also relevant to determining the amount in controversy for diversity jurisdiction). The court notes, moreover, that at the time of removal, Plaintiff's complaint sought injunctive relief against Western. Specifically, Plaintiff sought an injunction to enjoin Western from charging and collecting additional premiums from policyholders who pay their premiums on a basis other than annually without notice of the increased charge on those premium payments. Defendant asserts, and Plaintiff does not deny, that to comply with such an injunction Western would be forced to make company-wide changes that would cost more than $75,000. *In re Brand Name Prescription Drugs Antitrust Litg.*, 123 F.3d 599, 609 (7th Cir. 1997) (the amount in controversy for diversity jurisdiction has been met if complying with injunctive relief would cost Defendant more than $75,000).

[4]    The parties do not explain why Mikos was paying $36.48, rather than the stated monthly premium of $36.34.

On October 1, 1995, Mikos' "premium payments were discontinued resulting in a 'Reduced Paid Up Policy' with a net surrender value of $1,627 which included $370.23 in dividend accumulations."[5] (*Id.* ¶ 14.) As of the date the premiums were discontinued, Mikos had paid $5,544.99 in total premiums on the 1983 Policy. (*Id.*)

Plaintiff claims, further, that before her death on January 16, 2002, in the years 1999, 2000, and 2001, Mikos was suffering from dementia and other physical ailments that prevented her from discovering the incorrect billing statements. (*Id.* ¶ 16.) According to Plaintiff, Mikos suffered from declining health starting in 1987, at age 87, when she was diagnosed with cataracts in both eyes. (Plaintiff's Affidavit, Exhibit B to Plaintiff's Response ¶ 8.) In addition to her vision problems, Plaintiff asserts that Mikos also suffered from "heart concerns, weakness, disabling arthritis, dizziness, blackouts, seizures, TIAs, stroke, hyponatremia, anemia, two hip replacements and other major health problems." (*Id.* ¶ 9.) As a result of these health problems, Plaintiff claims, her mother was unable to effectively review and analyze her personal finances. (*Id.* ¶ 10.)

On January 16, 2002, Mikos died and on January 28, 2002, Western issued a death claim check for $1,756, which included accumulated dividends of $129. (Amended Compl. ¶¶ 2, 15.) The parties dispute whether or not Plaintiff provided a copy of Mikos' death certificate to Defendant. Plaintiff asserts that she provided Defendant with a copy of the document shortly after her mother's death. Defendant denies ever receiving the document, but presumably was willing to pay Plaintiff the death benefit even without seeing the death certificate. Western has not, however, paid the enhanced benefit available to insureds who were part of the *Kreidler* settlement, described below. In this litigation, Defendant contends Plaintiff is not eligible for that benefit because she has not furnished the death certificate.

---

[5]     Plaintiff's Amended Complaint is unclear whether Defendant discontinued billing Mikos for premiums or whether Mikos simply stopped paying them. The court presumes for the purposes of this motion that the premium payments were discontinued by Defendant and that Defendant subsequently notified Mikos regarding the value of the 1983 Policy.

In her affidavit, Plaintiff asserts that she contacted Defendant by telephone the week of January 21, 2002 regarding her mother's death and was advised that a Western agent would come to her home to gather additional information. (Tropp Affidavit ¶ 16.) According to Plaintiff, during the week of January 21, 2002, Plaintiff and her brother, Michael Mikos, met with two of Western's agents, one of whom Plaintiff remembers as being named "Judy," though she does not remember her last name. (*Id.* ¶ 17.) The affidavit of Plaintiff's brother supports her account of this meeting. (Affidavit of Michael Mikos, Ex. C to Plf.'s Response.) Plaintiff claims that she provided the agents with a copy of her mother's death certificate, and the agents explained that the death benefit on the 1983 Policy was $1,756. (Tropp ¶ 17.) Plaintiff asserts, further, that the agents did not mention the *Kreidler* lawsuit (described more fully below) or the settlement agreement, which had been entered a few months previously. (*Id.* ¶ 18.) Subsequently, on an undetermined date, Defendant issued Plaintiff a check in the amount of $1,756, the death benefit owed Plaintiff on Mikos' 1983 Policy. (*Id.* ¶18-19; Notice to Payee, Ex. A to Plf.'s Response.)[6] Plaintiff did not cash the check, however, because she had become suspicious of the premiums that her mother was being billed by Defendant and she did not want to take action that might jeopardize her legal right to a larger recovery. (*Id.* ¶ 21.)

Whether Plaintiff has in fact tendered the death certificate to Defendant is the only factual dispute in this case. In addition to her own affidavit and that of her brother, Plaintiff offers the affidavit of Earl Bonovich, who has 45 years of experience in the insurance industry, having worked as a licensed life insurance agent, administrator, general agent, life insurance consultant, supervisor, and trainer. (Bonovich Affidavit, Ex. A to Plaintiff's Response ¶¶ 1, 4.) Bonovich has no first-hand knowledge regarding whether or not the death certificate was tendered to Defendant,

---

[6]     The court notes that Plaintiff has supplied two exhibits marked "A," which are attached to her Response. This first is Bonovich's affidavit and the second is the Notice to Payee regarding the death benefit.

but he opined that Defendant would not make a payment on Mikos' insurance policy without being given the death certificate first. (*Id.* ¶ 18.) Defendant nevertheless insists that Plaintiff never provided her mother's death certificate. (Affidavit of Maureen Firestone, Ex. 4 to Def.'s Memorandum ¶ 6.) According to Maureen Firestone, Vice President and Director, Annuity Operation and Claims Administration for Western, the death certificate was not provided to Defendant, despite requests for the document by Defendant's agents. (*Id.* ¶¶ 2, 7, 8.) In fact, Defendant asserts that it stands ready to pay Plaintiff the enhanced "general relief" as soon as Plaintiff supplies a copy of the death certificate demonstrating that Mikos died within the necessary one-year time frame. (Firestone Aff. ¶ 9.)

The court notes that Plaintiff has not included a copy of the death certificate as an exhibit to her response, nor has she suggested that she gave her only copy to the agents at the January 21, 2002 meeting. More significantly, neither party addresses the question of whether Plaintiff could obtain an additional copy of the death certificate on request from local governmental officials. Defendant, for its part, has not addressed Mr. Bonovich's assertion that an insurer would not issue death benefits of any kind unless a death certificate were first provided.

In this lawsuit, Plaintiff alleges that Defendant violated the Consumer Fraud Act by continuing to bill Mikos for an annual premium of $437.76, when she should have paid only $364.90 per year. (Amended Compl. ¶¶ 12, 13, 14, 25, 26.) Plaintiff asks the court to certify a class of Western policyholders who were overcharged for their annual premium by Defendant. (*Id.* ¶ 18.)

**_Kreidler_ Class Action Lawsuit**

Plaintiff and Defendant both recognize that the resolution of Defendant's summary judgment motion hinges on whether or not Mikos was a class member in the *Kreidler* class action lawsuit filed against Western that was terminated by settlement agreement on October 23, 2001. The *Kreidler* case was a nationwide class action lawsuit against Western, brought by policyholders seeking

6

damages in connection with certain practices related to Western's marketing and administration of class members' insurance policies. According to Plaintiff, her consumer fraud claim is not barred by the *Kreidler* settlement because Mikos' policy was not within the scope of the settlement agreement. In pursuing counts II-V, however, Plaintiff argues in the alternative. She argues that if the court finds that she is a member of the *Kreidler* class, Defendant has violated the settlement agreement by not providing her with the general relief described in the settlement agreement.

On March 30, 1995 the *Kreidler* lawsuit was filed against Western by Joseph Kreidler and a number of additional plaintiffs. (*Kreidler* Court's Finding of Fact and Conclusions of Law, Exhibit C to Firestone Affidavit, at 2.) The *Kreidler* court certified a nationwide class on April 14, 1999, and Western appealed that order on May 14, 1999. (*Id.* at 3.) The parties entered into settlement negotiations during the pendency of the appeal, however, and on December 20, 2001, the case was remanded to the trial court for settlement purposes. (*Id..*)

On June 14, 2001, Plaintiffs in the *Kreidler* class action filed a second amended complaint ("SAC"), raising claims similar to those in the original complaint and adding an additional defendant.[7] (*Id.* at 3-4.) The SAC alleges that plaintiffs were victims of "a fraudulent scheme and common course of conduct by [Western] and they purchased life insurance policies from [Western] based upon the deceptive sales practices . . . ." (SAC ¶ 103.) The complaint describes the Western insurance policies involved in the lawsuit as "complex, interest-sensitive life insurance policies designed to produce cash and surrender values dependent on one or more non-guaranteed elements other than premiums." (*Id.* ¶ 1.) The SAC alleges expansively that "[t]he case is brought on behalf of plaintiffs individually, and as a class . . . on behalf of all persons or entities who have or had an interest in individual permanent life insurance policies (*i.e.* whole life

---

[7] The original complaint was filed against Defendant Western and Southern Life Assurance Company, but in the SAC, Plaintiffs added Western-Southern Life Insurance Company. (*Id.* at 2-3.)

insurance and universal life) issued by [Western] . . .and taken from January 1, 1981 through and including December 31, 1998." (*Id.* ¶ 2.)

The SAC raises a number of very specific allegations regarding the deceptive sales and marketing practices used by Western. Specifically, the SAC alleged that "Western Southern misrepresented and/or failed to disclose the nature, characteristics, terms, . . . descriptions and actual operation of the Policies, including . . . the method of calculating . . . fees . . . charges, distribution costs and/or administrative expenses." (*Id.* ¶ 21.) The SAC stated, further, that as a result of these practices, class members were "fraudulently induced to purchase or increase life insurance policies through the systematic omission or misrepresentation of material facts concerning the nature and terms of the policies, including premium payments." (*Id.* ¶ 81.) According to the *Kreidler* plaintiffs, Western had a fiduciary duty to class members which it breached by failing to disclose numerous material facts. (SAC ¶¶ 95, 100.)

The SAC also alleged certain deceptive practices by Western in connection with specific insurance policies. The SAC states that Western used an "investment and money accumulation sales practice," which involved marketing life insurance policies as an investment product, while downplaying or concealing the fact that the product was actually life insurance that carried a death benefit. (*Id.* ¶¶ 28-29.) Western allegedly utilized "replacement sales practices," which involved agents encouraging policy holders to replace existing life insurance policies with new policies. (*Id.* ¶ 39.) This replacement practice was very lucrative for Western and its agent, but served as a financial detriment to the policyholder. (*Id.* ¶ 40.) The SAC alleged, further, that Western utilized "vanishing premium" sales practices. (*Id.* ¶ 51.) This deceptive practice entailed agents marketing policies by stating that only a fixed number of premium payments were required before the premium would "vanish" and the policy holder was "paid up." (*Id.*) In reality, these premiums never "vanished" and policy holders, instead, were required to make premium payments for the life of the policy. (*Id.*)

Plaintiff asserts that Mikos' policy was not included in the scope of this SAC. In support of this assertion, Plaintiff again relies on the opinion of Earl Bonovich. Bonovich opined that "[t]he billing practice complained about in the *Tropp* Amended Complaint is not the subject of the *Kreidler* Second Amended Class Action Complaint . . . . " (Bonovich Affidavit, Ex. A to Plaintiff's Response ¶ 9(b).) Bonovich stated, further, that "[t]he allegations of the wrongful conduct of the defendant made in the Second Amended Complaint of *Kreidler* are completely different than the allegations of wrongdoing alleged in the Plaintiff's amended complaint." (*Id.* ¶ 9(c).) Specifically, Bonovich stated that the *Kreidler* SAC was concerned with wrongful sales practices, not with overcharging for premiums, as alleged by Plaintiff here. (*Id.* ¶17.) Thus, according to Bonovich, the Plaintiff's claim has no relation to the wrongful inducement claims alleged in the *Kreidler* SAC. (*Id.*)

On June 14, 2001, the same day the SAC was filed, the parties in the *Kreidler* lawsuit entered into a settlement agreement, which was subject to the approval of the Ohio trial court. (Order Preliminarily Approving Settlement, Exhibit B to Affidavit of Maureen Firestone, at 1.) On June 15, 2001, the trial court issued its "Findings and Order Preliminarily Approving Settlement, Conditionally Certifying a Class for Settlement Purposes Only, Appointing Lead Counsel for the Class, Directing the Issuance of a Class Notice to the Class and Scheduling a Settlement Hearing," (*Id.*) In this order, the court granted preliminary approval of the parties' proposed settlement, directed that notice be sent to the class, and scheduled a hearing for October 23, 2001, at which time the court would make a finding as to the fairness, reasonableness and adequacy of the proposed settlement. (*Id.* at 4.) The court's June 15, 2001 order directed that notice be furnished to class members, defined as "all persons who are or were owners of a Policy or Policies." (*Id.* at 2.) The court's order defined "Policy" as "one or more individual permanent life insurance policies (i.e. Traditional Life and Universal Life Policies) . . . issued in the United States by [Western] . . . and taken . . . during the Class Period," which is anytime between January 1, 1981 and December 31, 1998. (*Id.* at 2-3.) Western or its designee was responsible for providing class notice to each

9

policy owner who fit the class definition. (*Id.* at 5.) This notice was to be sent to the last known address for each class member no later than 60 days before the settlement hearing. (*Id.*)

Western assigned the responsibility for mailing the class notice materials to a contract claims administrator, Rust Consulting. (Affidavit of Kim Schmidt, Ex. 2 to Def.'s Motion, at 1-2; *Kreidler* Court's Finding of Fact and Conclusions of Law, Ex. C. to Firestone Affidavit ¶.) Kim Schmidt, Senior Administrator for Rust Consulting, who was personally involved in both the planning and administration of the *Kreidler* settlement, described Rust Consulting's practice for mailing the class notice packages to each member of the class. (Schmidt Affidavit, at 2.) Each of these packages contained a "a detailed description of the Class Action Litigation, the Class Settlement, and a complete copy of the release and waiver." (*Id.*; Sample Class Notice Package, Ex. A. to Schmidt's Affidavit.) The packages also contained the class definition and instructions for any class member who wished to opt out of the settlement agreement. (Schmidt Affidavit, at 2; Sample Class Notice Package.) On approximately August 20, 2001, Rust Consulting mailed a Class Notice package to the last known address of Mary E. Mikos at 12754 Lincoln Street, Blue Island, Illinois 60406-2214. (Schmidt Affidavit, at 2; Copy of Envelope Addressed to Mikos, Ex. A to Schmidt's Affidavit.) According to Schmidt, the envelope sent to Mikos was not returned to Rust Consulting by the United States Postal Service, nor did Rust Consulting receive an exclusion request from Mikos. (Schmidt Affidavit, at 2.)

On October 23, 2001, the Ohio Trial Court issued its "Order Approving Class Action Settlement." (Order Approving Class Action Settlement, Ex. A to Firestone's Affidavit at 1.) The court certified a class of "all persons who are or were owners of a Policy or Policies, except . . . any owner of a Policy or Policies who timely excludes himself or herself from the Class . . . ." (*Id.* at 4-5.) The court went on to define "Policy" or "Policies" to mean "one or more individual permanent life insurance policies (i.e. Traditional Life and Universal Life Policies ) (including any riders or endorsements), issued in the United States by [Western] . . . and taken (that is, accepted by the

Policy holder with payment of at least one premium) during the Class Period . . . ." (*Id.* at 4.) In addition, the court found that the Class Notice was proper because it "fully satisfied" the Ohio Rules of Civil Procedure, the Ohio State Constitution and the United States Constitution. (*Id.* at 6.) The court also approved the parties' proposed settlement agreement, stating: "The terms and provisions of the Settlement Agreement . . . have been entered into in good faith and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the parties and the Class Members . . . ." (*Id.*)

By virtue of the *Kreidler* settlement agreement, the class members were eligible for either "General Relief" or "Claim Evaluation Process (CEP) Relief." (Sample Class Notice Package, at 3.) Under the General Relief option, class members would "receive coverage under a Settlement Death Benefit simply by remaining in the Class and not electing to participate in CEP." (*Id.*) The Settlement Death Benefit (SDB) provides for a payment, following Western's receipt of proof that the insured died within a year of the date that the settlement agreement was entered. (*Id.* at 9.) Under the alternative CEP relief, any class members who believed he or she was harmed by wrongdoing in connection with a policy had been invited, in the notices sent by Rust Consulting, to complete and submit a CEP election form by September 23, 2001. Following approval of the settlement, class members who elected the CEP remedy submitted claims forms to be reviewed by a neutral third party. (*Id.* at 12-14.)

The settlement agreement also included a "Release and Waiver" section, which, the court stated, "forever discharges the Released Parties from any claims or liabilities arising from or related to the Released Transactions." (Order Approving Class Action Settlement, at 8.) This release is binding on all class members and serves to release Western from future claims related to the SAC raised by class members, individually or as a class. (*Id.*) The wording of the release was very broad; because its language is critical to the resolution of Defendant's motion, the court quotes extensively. The settlement agreement defined "Released Transactions" as the "marketing,

11

solicitation, application, underwriting, acceptance, sale, purchase, face amount change, operation, retention, administration, interest crediting, servicing, or replacement . . . of the Policies, or any insurance policy . . . sold in connection with, or relating in any way directly or indirectly to the sale or solicitation of, the Policies including, without limitation, the matters described in the Release."

(*Id.* 12-13.)

The "Release and Waiver" section of the settlement agreement states:

A.     The Releasing Parties hereby expressly agree that they shall not now or hereafter institute, maintain or assert against the Released Parties, directly or indirectly, on their own behalf, on behalf of the Class or any other person, and release and discharge the Released Parties from, any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights -known or unknown - (including without limitation claims for rescission, restitution, attorney's fees, damages of any kind, including actual damages and those in excess of actual damages; and claims for mental anguish), of any kind or nature whatsoever, whether based on federal, state or local statute or ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by the Releasing Parities or any of them in the Action or the other Actions or in any other court action or before any administrative body (including any action brought by or on behalf of any state attorney general or Department of Insurance or other regulatory entity or federal, state or local prosecutorial or other organization), tribunal or arbitration panel on the basis or, connected with, arising out of, or related to, in whole or in part, the Released Transactions, which include, without limitation:

    (1)    any and all acts, omissions, nondisclosures, facts, matters, transactions or occurrences, or any oral or written statements or representations or fraud that have been, could have been, may be, or still could be directly or indirectly alleged, asserted, described, set forth or referred to in the Action or the other Actions;

    (2)    Any or all of the acts, omissions, nondisclosures, facts, matters, transactions, occurrences, or any oral or written statements or representations or fraud allegedly made in connection with or directly or indirectly relating to the Released Transactions, including without limitation, any acts, omissions facts, matters, transactions, occurrences, or oral or written statements or representations relating to:

        (a)    the number and/or amount of out-of-pocket payments that were paid or would need to be paid for a Policy or Policies, now or in the future;

        . . .

(d)    . . . the nature, characteristics, terms, appropriateness, suitability, descriptions and operation of a Policy or Policies or changes in the size of a Policy or Polices;

(e)    the amount or method of calculation of fees, charges, commissions, distribution costs, administrative expenses and/or taxes in connection with the sale or, as part of the premiums for, or in connection with a full or partial surrender or termination of a Policy;

. . .

(r)    . . . the timing of the crediting of premium payments; Policy or premium charges and monthly deductions; illustrations of . . . premium charges, monthly deductions, cost of insurance and administrative charges, cash values or death benefits;

. . .

(s)    the adequacy of the description of those items in Section . . . A.2(r) above;

. . .

    (aa)    any actual or alleged violation of any statute, regulation or other law relating to life insurance sales practices or consumer sales practices;

    . . .

    (cc)    violations of any state or federal statute, regulation, or other law prohibiting . . . (ii) unfair, unlawful and/or deceptive trade practice or business practices, or (iii) untrue or misleading statements including false advertising;

    (dd)    . . . the calculation of Policy benefits and/or costs;

    . . .

B.    The Releasing Parties expressly agree that this Release will be, and may be raised as, a complete defense to and will preclude any action or proceeding encompassed by the release of the Released Parties herein.

. . .

E.    In connection with this Release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts or law in addition to or different from those that they now know or believe to be true with respect to the matters released herein . . . . Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their

Polices.

. . .

G.     Except as previously set forth, it is the intention of the Releasing Parties, in executing this Release, fully, finally and forever to settle and release all matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed, pertaining to Western-Southern's insurance sales practices (whether or not previously or currently asserted in any Action) with regard to the Policies.

(*Id.* at 14-21.)

The *Kreidler* court's October 23, 2001 order dismissed the case on the merits with prejudice. (*Id.* at 28.) Plaintiff asserts that her claim (that Defendant billed her for a policy premium in excess of the agreed amount) was not the subject of the SAC in *Kreidler* and that the settlement agreement's release provisions are inapplicable to her claim. Not surprisingly, Defendant argues the opposite, that Plaintiff's claim falls within the same conduct complained about in *Kreidler* and is barred by the terms of the settlement agreement. In the alternative, Plaintiff asserts that Defendant has denied her relief to which she is entitled under the *Kreidler* settlement.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Dyson v. City of Chicago,* 282 F.3d 456, 462 (7th Cir. 2002). For purposes of summary judgment, the court does not weigh the evidence but merely determines if "there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), drawing all reasonable inferences from undisputed facts in favor of the nonmoving party. *Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996), *cert. denied,* 519 U.S. 1109 (1997). Summary judgment is particularly appropriate where the language of an agreement is at issue: "the interpretation of a

14

contract is a question of law and therefore may properly be decided on a motion for summary judgment." *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164, 765 N.E.2d 513, 516 (2d Dist. 2002). With these standards in mind, the court turns to the parties' arguments.

## II.    Consumer Fraud and Deceptive Business Practices Act

Plaintiff claims that Defendant violated the Consumer Fraud and Deceptive Business Practices Act by mailing Plaintiff's mother, Mary Mikos, bills for policy premiums that were in excess of those stated in the Policy itself. Specifically, Plaintiff asserts that after more than three years of paying on the 1983 Policy, Mikos should have been charged an annual premium of $364.90, but instead Defendant charged her an annual premium of $437.76. Plaintiff alleges that by overcharging on the premium, Defendant violated the Consumer Fraud and Deceptive Business Practices Act.[8] For the purposes of this motion, Defendant does not deny that it overcharged Mikos on the 1983 Policy. Instead, Defendant argues that this claim is barred by: (1) the terms of the release contained in the *Kreidler* class action settlement; (2) the doctrine of *res judicata*; and (3) the statute of limitations applicable to the Consumer Fraud Act. Plaintiff argues, however, that her policy and her claim are distinct from those raised in the *Kreidler* case and as a result, the release and the doctrine of *res judicata* do not bar her claim. In addition, Plaintiff asserts that her claim is not barred by the statute of limitations because Mikos was incapable of discovering the

---

[8]     Specifically, the Act provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

overcharges herself and the violations were first discovered by Plaintiff within the proper statutory period.

Defendant argues, first, that the release contained in the settlement agreement terminating the *Kreidler* lawsuit bars Plaintiff's claim here. As explained above, the *Kreidler* settlement was a detailed document that concluded the *Kreidler* class action lawsuit against Defendant and included a "Release and Waiver" section, which released Defendant from certain future claims by class members. In response, Plaintiff argues that the interpretation of the release terms can not be determined by the terms of the release itself and instead the court must decipher the intent of the parties by examining all of the surrounding circumstances. Specifically, Plaintiff argues that it was not Defendant's intent to include Mikos' policy in the *Kreidler* settlement agreement because Defendant never mentioned the settlement agreement when it paid out on Mikos' 1983 Policy. (January 28, 2002 Letter from Defendant to Plaintiff, Ex. A to Plf.'s Response.) To the extent the court understands Plaintiff's argument here, the court believes that Plaintiff is arguing that the intent of the parties is a question of fact, which the court should not determine at this stage of the litigation. The court disagrees.

Under Illinois law, "a release is a contract whereby a party abandons a claim to the person against whom the claim exists." *Loberg v. Hallwood Realty Partners, L.P.*, 323 Ill. App. 3d 936, 941, 753 N.E.2d 1020, 1024 (1st Dist. 2001). Illinois courts treat a settlement agreement in the same manner as other contracts. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 548 (4th Dist. 1999). Accordingly, "the rights of the parties are limited to the terms expressed in the agreement and a release will not be construed to release claims not within the contemplation of the parties." *Loberg*, 323 Ill. App. 3d at 941, 753 N.E.2d at 1024. The court notes, however, that "[w]here the terms of the release are clear and explicit, the court must enforce the release as written." *Id.* Thus, to the extent the terms of the *Kreidler* release are clear and explicit, the court will enforce those terms as written. *Id.* at 945, 753 N.E.2d at 1028 (Illinois Appellate Court affirmed

order of trial court finding Illinois litigation involving the state securities laws was barred by a settlement release clause included in the final judgment of a California case).

Plaintiff argues, next, that Mikos' 1983 policy was not one of those included within the scope of the *Kreidler* settlement and therefore Plaintiff is not bound by the terms of that agreement, including the release provisions. Specifically, Plaintiff argues that the *Kreidler* class action involved only "vanishing premium" polices and policies that were "interest-sensitive." In support of this argument, Plaintiff provides the Affidavit of Earl Bonovich, who, as explained above, has worked extensively in the insurance industry. Bonovich stated in his affidavit that the policies at issue in *Kreidler* involved premiums that included insurance against death and a portion for investment and, in addition,"vanishing premium" policies. According to Bonovich, because Mikos' policy did not have an investment aspect to it and it was not a "vanishing premium" policy, her policy was not covered by the *Kreidler* settlement.

Bonovich has not cited specific language from the settlement agreement to support his opinion. In any event, the court questions the relevance of an expert opinion regarding a document that the court does not find ambiguous. *See Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291, 186 N.E.2d 285, 287 (1962) ("[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.") In this case, the plain wording of the settlement agreement belies the narrow interpretation provided by Bonovich. Specifically, the settlement agreement bound the class, which the court stated was "all persons who are or were owners of a Policy or Policies, except . . . . any owner of a Policy or Policies who timely excludes himself or herself from the Class . . . ." (Order Approving Class Action Settlement, at 4-5.) The court went on to define "Policy" or "Policies" to mean "one or more individual permanent life insurance policies (i.e. Traditional Life and Universal Life Policies ) (including any riders or endorsements), issued in the United States by

[Western] . . . and taken (that is, accepted by the Policy holder with payment of at least one premium) during the Class Period . . . ." (*Id.* at 4.) The settlement agreement defines "Traditional Life Insurance" as "whole life insurance policies and endowment policies, other than Universal Life Insurance." (*Id.* at 13.) In addition, the settlement agreement defines "Universal Life Insurance" as "interest sensitive insurance policies." (*Id.*)

As reflected in this language, the settlement agreement, which was approved by the *Kreidler* court, defines the class very broadly. Further, the agreement's plain language demonstrates that it is not limited in scope to "interest sensitive" policies. The definition of Universal and Traditional Life Insurance in the class definition makes it sufficiently clear that both interest-sensitive policies (Universal) and non-interest-sensitive policies (Traditional) were covered by the definition. Nor does the definition suggest that policies covered by the settlement agreement are limited to "vanishing premium" policies. In fact, the term "vanishing premium" is not used in either of these definitions. In the absence of such a term from the definition and without any explanation as to why the *Kreidler* court would leave such an important term out of the definitions, this court is unwilling to read such a limitation into the definitions at this time.

Plaintiff insists that her policy was not covered by the *Kreidler* settlement agreement, but she fails to address the fact that she was sent notice of the class action and failed to "opt out" of the class action. Defendant has provided a substantial amount of evidence demonstrating that Rust Consulting, the class action administrator, mailed a "Class Notice Package" to Mikos. There is no evidence that this package failed to reach Mikos or that she decided to opt out of the class settlement. A class member who fails to opt out is considered a part of the class for the purposes of the settlement agreement. (Order Approving Settlement, at 3-4.) Although Plaintiff has claimed that Mikos was incompetent and unable to discover that she was being overcharged for premiums by Defendant, she has not argued that Plaintiff was incapable of understanding the class notice materials. Nor would this argument be successful. As the Ohio trial court observed, the notice in

18

*Kreidler* was "reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice . . ." (*Id.* at 6.)

Plaintiff argues, next, that her claim related to overcharging is not one of the claims covered by the *Kreidler* release. In support of this argument, Plaintiff relies on the opinion of Bonovich and the definition of "Released Transactions" contained within the Settlement Agreement. Bonovich stated in his affidavit that "[n]othing in the releasing language . . . refers to the type of policy or the allegations of wrong doing alleged to have occurred in the Tropp Amended Complaint." Bonovich again offers his opinion in this matter without citing specific language from the settlement agreement or more specifically, the release provisions.

Although the definition of "Released Transactions" does not expressly include Defendant's overcharging for premiums, the court concludes that Plaintiff's claim is covered by the release language itself. As set forth above, the release contains a number of claims against Defendant that class members waived. Specifically, the settlement agreement released claims relating to the "amount of out-of-pocket payments that were paid or would need to be paid for Policy or Policies, now or in the future." (Order Approving Settlement Agreement, at 15.) The settlement agreement also released claims for "the amount or method of calculation of fees, charges [or] administrative expenses . . . as part of the premiums for . . . a Policy." (*Id.* at 16.). In addition, the settlement agreement also barred claims related to "policy charges" or "premium charges," including "the adequacy of the description of those items." (*Id.* at 17-18).[9] Plaintiff does not explain how her claim falls outside of these specific provisions. Accordingly, the court will enforce the terms of the

---

[9]      If the language already quoted were not enough, the court notes, further, that the release provisions of the settlement agreement also bar any claim for "any actual or alleged violation of any statute, regulation or other law relating to life insurance sales practices or consumer sales practices" and "violations of any state or federal statute, regulation, or other law prohibiting . . . (ii) unfair, unlawful and/or deceptive trade or business practices or (iii) untrue or misleading statements . . ." (*Id.* at 19.) This language of the release also serves as a basis to bar Plaintiff's claim under the Consumer Fraud and Deceptive Business Practices Act.

*Kreidler* settlement agreement and finds that Plaintiff's claim under the Consumer Fraud Act is barred.

Because the court has determined that Plaintiff's claim is barred by the release provisions of the settlement agreement, the court does not need to address Defendant's remaining arguments pertaining to the doctrine of *res judicata* and the applicable statute of limitations.

## III.    Counts II - V

As set forth above, Plaintiff claims that if Mikos is a class member for purposes of the *Kreidler* class action settlement agreement, she is entitled to relief under the terms of that agreement.    Plaintiff's remaining claims (breach of contract, breach of fiduciary duty, an accounting, and unjust enrichment) all stem from her allegation that Defendant failed to provide the Settlement Death Benefit (SDB) available to the beneficiaries of class members who died within a years of the *Kreidler* settlement agreement.  Defendant acknowledges its obligations under the agreement and asserts that it stands ready to pay Plaintiff the enhanced benefit when she presents a death certificate.  (Reply, at 13.)    Because she has not yet done so, Defendant asserts that Plaintiff lacks standing to assert this claim.

To establish that she has standing, Plaintiff need only show that she suffered an injury caused by Defendant's conduct for which she seeks a remedy in this court. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61  (1992).  In this court's view, Plaintiff has met this test. Plaintiff claims that Defendant has refused to pay benefits to which she is entitled.  Her complaint seeks recovery of the amounts at issue.

Although there is no dispute regarding Defendant's obligations under the *Kreidler* settlement agreement, there is a question of fact regarding whether or not the death certificate was tendered. Plaintiff asserts that she tendered the document shortly after her mother's death in order to obtain the death benefits set forth in the 1983 Policy.  Defendant, for its part, asserts that Plaintiff has not

yet tendered the death certificate; but Defendant has not responded to the contention, supported by Mr. Bonovich's affidavit, that Western would not have paid any death benefit at all had Plaintiff not done so. At this point in the litigation, the court will not select one version of the events over the other. A dispute of fact precludes summary judgment on counts II through V.

In denying this motion, the court suggests that a resolution of this dispute may be very straightforward. If Plaintiff retains a copy of the death certificate, or can obtain another one, Defendant is committed to paying the additional benefit. The court expects the parties to meet and confer in an attempt to resolve this matter prior to the next scheduled status conference.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment (Doc. No. 7-1, 40-1) is granted in part and denied in part. Plaintiff's claim in count I under the Illinois Consumer Fraud and Deceptive Business Practices Act is barred by the release provisions contained in the *Kreidler* settlement agreement. Accordingly, the motion for summary judgment is granted with respect to that count. There remains, however, a genuine issue of fact regarding whether or not Plaintiff provided Mikos' death certificate to Defendant. As a result, the court denies Defendant's motion without prejudice as to counts II-V (breach of contract, breach of fiduciary duty, an accounting, and unjust enrichment). Pending a determination whether Plaintiff Tropp has complied with the condition precedent for recovery of the SDB benefit, her motion for class certification (Doc. No. 33-1) is denied without prejudice.

ENTER:

Dated: July 18, 2003

REBECCA R. PALLMEYER
United States District Judge